# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00462-CV

**David Dewhurst, Tom Craddick, Susan Combs, State of Texas,
and the Texas Legislative Budget Board, Appellants**

**v.**

**Edd Hendee, Individually and as
Executive Director of C.L.O.U.T., Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
## NO. D-1-GN-06-002156, HONORABLE JOSEPH H. HART, JUDGE PRESIDING

## O P I N I O N

This is an interlocutory appeal from an order of the district court granting in part and denying in part a plea to the jurisdiction asserted by appellants following our partial remand in *Hendee v. Dewhurst*, 228 S.W.3d 354 (Tex. App.—Austin 2007, pet. denied) ("*Hendee I*"). In *Hendee I*, we affirmed in part and reversed in part a judgment of the district court granting a prior plea to the jurisdiction and dismissing the plaintiffs' suit for want of subject-matter jurisdiction. Following our remand, appellants filed another plea to the jurisdiction, raising new grounds regarding the causes of action that had survived the first proceeding. The district court, with a different visiting judge presiding, granted the plea with respect to the same causes of action whose dismissal we affirmed in *Hendee I*, but otherwise denied it. Concluding that appellants have conclusively negated the district court's subject-matter jurisdiction over all of the causes of action

challenged in the second plea to the jurisdiction, we will reverse the portion of the district court's order denying the plea and render judgment dismissing all of these causes of action for want of subject-matter jurisdiction.

## BACKGROUND

**The lawsuit**

The nature of the underlying action and its constitutional and statutory backdrop are detailed in *Hendee I*. To summarize, in June 2006, Edd Hendee, individually and as executive director of the group Citizens Lowering Our Unfair Taxes PAC (C.L.O.U.T.) (collectively, Plaintiffs), filed suit against the Lieutenant Governor, the Speaker of the House of Representatives, the Comptroller, and the members of the Legislative Budget Board (LBB),[1] all in their official capacities (collectively, the State Defendants[2]). Relying on principles of taxpayer standing—the exception to general standing limitations that permits "a taxpayer . . . to sue in equity to enjoin the

---

[1] The LBB is a permanent joint committee of the Texas Legislature comprised of the lieutenant governor, speaker of the house of representatives, the chairman of the senate finance committee, the chairman of the house appropriations committee, the chairman of the house ways and means committee, three members of the senate appointed by the lieutenant governor, and two additional house members appointed by the speaker. Tex. Gov't Code Ann. § 322.001(a) (West 2005). The lieutenant governor and speaker of the house are joint chairs of the LBB. *Id.* § 322.001(b). The LBB develops budget and policy recommendations for legislative appropriations, including a draft General Appropriations Act each session, *id.* § 322.008(c) (West 2005), and fiscal impact statements regarding other proposed legislation. *Id.* § 314.001 (West 2005).

[2] Plaintiffs also named "the State of Texas" as a defendant, which is the effect of their naming the other defendants in their official capacities. *See Perry v. Del Rio*, 53 S.W.3d 818, 822-23 (Tex. App.—Austin 2001), *pet. dism'd*, 66 S.W.3d 239 (Tex. 2001).

2

illegal expenditure of public funds, even without showing a distinct injury"[3]—Plaintiffs sought declaratory relief challenging the legality of prospective state expenditures authorized under H.B. 1 or other appropriations by the 79th Legislature[4] on the basis that the underlying appropriations violated the Texas Constitution and statute.[5] The cornerstone of Plaintiffs' suit was article VIII, section 22(a) of the Texas Constitution:

> In no biennium shall the rate of growth of appropriations from state tax revenues not dedicated by this constitution exceed the estimated rate of growth of the state's economy. The legislature shall provide by general law procedures to implement this subsection.

Tex. Const. art. VIII, § 22(a). An "appropriation" refers to a legislative enactment authorizing state funds to be expended for particular purposes. The constitution elsewhere requires that "[n]o money shall be drawn from the Treasury but in pursuance of specific appropriation made by law; nor shall any appropriation of money be made for a longer term than two years." *See*

---

[3] *Hendee v. Dewhurst*, 228 S.W.3d 354, 373-74 (Tex. App.—Austin 2007, pet. denied); *see id.* at 378-82 (analyzing the Texas Supreme Court's jurisprudence on the subject).

[4] As we explained in *Hendee I*, H.B. 1 responded to the Texas Supreme Court's decision in the *Neeley v. West Orange Cove* case. *Neeley v. West Orange Cove-Consolidated Indep. Sch. Dist.*, 176 S.W.3d 746 (Tex. 2005). The supreme court held that Texas's public school finance system constituted an unconstitutional state property tax and gave the legislature until June 1, 2006, to enact corrective legislation. *Id.* at 800. During the 79th Legislature's third called session of April and May 2006, it succeeded in enacting H.B. 1, which the Governor signed into law on May 31 of that year. H.B. 1 attempted to shift some of the burden of funding Texas's public schools from local property taxpayers to the state and, to that end, made additional appropriations for the biennium ending on August 31, 2007.

[5] Although Plaintiffs did not then seek to enjoin the expenditures, there has been no dispute that their declaratory claims challenging the expenditures' legality would logically be governed by the same taxpayer-standing principles. *See Hendee I*, 228 S.W.3d at 379 n.31.

3

Tex. Const. art. VIII, § 6. "State tax revenues not dedicated by this constitution" refers to one source of funds that the legislature could appropriate; others include non-tax revenues and tax revenues whose use is dedicated by the constitution. *Hendee I*, 228 S.W.3d at 359-60. The "biennium" runs from September 1 of each odd-numbered year through August 31 of the succeeding odd-numbered year. *See id.* at 360 n.3.

Plaintiffs alleged that appropriations from non-dedicated state tax revenues for the biennium beginning September 1, 2005 and ending August 31, 2007 (the "06-07 biennium"[6]) violated article VIII, section 22 both because the specific amount of those appropriations exceeded the constitutional limit and because the legislature's "procedures to implement this subsection" systematically cause noncompliance with that limit. The legislature has implemented article VIII, section 22 primarily through chapter 316 of the government code. Chapter 316 requires that, in advance of each biennial regular legislative session, the LBB must calculate the "spending cap," or "the amount of state tax revenues not dedicated by the constitution that could be appropriated within the limits established by the estimated rate of growth of the state's economy." Tex. Gov't Code Ann. § 316.002(a)(3) (West 2005). The LBB is to establish this figure by determining (1) "the estimated rate of growth of the state's economy from the current biennium to the next biennium," and (2) "the level of appropriations for the current biennium from state tax revenue not dedicated by the constitution," and then (3) applying the former to the latter. *Id.* § 316.002(a). The requirement that the LBB calculate the spending cap before each regular legislative session, as well as the

---

[6] We will similarly use "08-09 biennium" to describe the now-current biennium that began on September 1, 2007 and will end on August 31, 2009; "04-05 biennium" to describe the September 1, 2003-through-August 31, 2005 biennium that preceded the 06-07 biennium; etc.

cap itself, are enforced through a range of procedures and checks in the legislative process. *See id.* §§ 316.002(d), (e), .006-.008 (West 2005); *Hendee I*, 228 S.W.3d at 361-63.

Subject to an exception that has undisputedly never been invoked, the LBB "shall determine the estimated rate of growth of the state's economy" based on "estimated Texas total personal income" or "state personal income" (SPI), "dividing the estimated Texas total personal income for the next biennium by the estimated total Texas personal income for the current biennium." *Id.* § 316.002(b); *see id.* § 316.002(c) (permitting adoption of "a more comprehensive definition of the rate of growth" by "the committee established by Section 316.005"). "Using standard statistical methods, the board shall make the estimate by projecting through the biennium the estimated Texas total personal income reported by the United States Department of Commerce or its successor in function." *Id.*

The other component of the spending cap, to which the growth rate is applied—the "level of appropriations for the current biennium from state tax revenues not dedicated by the constitution"—is also partly an estimate, as we explained in *Hendee I*, for reasons related to the nature of appropriations. *See Hendee I*, 228 S.W.3d at 361-62. Even without additional legislative action, the amount of an appropriation, as well as its funding source—e.g., whether the money comes from non-dedicated state tax revenues (subject to the spending cap) or dedicated tax revenues or federal funds (not subject to the cap)—may change during a biennium, such as when changes in economic conditions not originally forecasted impact the amount or composition of funding sources subject to an appropriation. *Id.* Because the "level of appropriations for the current biennium from state tax revenues not dedicated by the constitution" is calculated during the current biennium, it is

5

comprised of both actual appropriations of non-dedicated tax revenues (appropriated non-dedicated tax revenues that have already been spent, and whose amount is thus finally ascertainable) and estimated appropriations of non-dedicated tax revenues (the amount of such funds that the LBB anticipates will be spent pursuant to appropriations during the remainder of the biennium). *Id.* Reflecting the potential for unforeseen changes in the amount or funding source of appropriations later in the biennium, the LBB determines "the level of appropriations for the current biennium from state tax revenues not dedicated by the constitution" and the corresponding spending cap for the next biennium "subject to adjustments resulting from revenue forecast revisions or subsequent appropriations certified by the Comptroller." *Id.* This characteristic of appropriations, furthermore, impacts determination of the amount of additional appropriations from non-dedicated state tax revenues that can be made in the current biennium without exceeding the current biennium's spending cap.

Before approving its determination of the SPI-based "estimated rate of growth of the state's economy," the "level of appropriations for the current biennium from state tax revenues not dedicated by the constitution," and the resulting spending cap for the next biennium, the LBB must publish in the *Texas Register* "the proposed items of information and the methodology used" in making these calculations and, by December 1 of each even-numbered year, hold a public hearing regarding those matters. Tex. Gov't Code Ann. §§ 316.003-.004 (West 2005). Once it approves the three items, the LBB "shall submit the information to a committee composed of the governor, lieutenant governor, speaker of the house of representatives, and comptroller," which has ten days to "meet and finally adopt the items, either as submitted by the board or as amended by the

committee." *Id*. § 316.005 (West 2005). However, if the committee fails to act by the deadline, the items are "treated as if the committee had adopted them as submitted." *Id.*

In the case of the 06-07 biennium, it is undisputed that in November 2004, the LBB adopted by resolution—deemed approved by the section 316.005 committee—an 11.34% "estimated rate of growth of the state's economy [i.e., of SPI] from the current [04-05] biennium to the next [06-07] biennium" and a "level of appropriations for the current [04-05] biennium from state tax revenues not dedicated by the constitution" of $46.8 billion. Applying the growth rate to its calculation of current-biennium appropriations, the LBB in its resolution adopted a 06-07 spending cap of $52.145 billion.

Plaintiffs pled numerous declaratory claims predicated on essentially four liability theories.[7] First, Plaintiffs alleged that the legislature and LBB's use of SPI to calculate "the estimated rate of growth of the state's economy" and the spending cap violates article VIII, section 22. They urged that, as a matter of constitutional interpretation, the "estimated rate of growth *of the state's economy*" requires a broader measure of economic growth than SPI, which they criticized as a mere "component" of "the state's economy." Plaintiffs pled that SPI "has been historically proven to wildly overstate the growth in the state's economy, permitting excessive increases in spending contrary to the intent of the constitutional and statutory spending restraint provision at issue in this case." Plaintiffs further pled that other alternative measures would more

---

[7] As we observed in *Hendee I*, several of Plaintiffs declaratory claims went beyond seeking determinations that expenditures and their underlying appropriations were illegal, and purported to request that the district court improperly specify particular means by which the State Defendants would be required to implement article VIII, section 22. *Hendee I*, 228 S.W.3d at 372 n.23.

accurately calculate "growth in the state's economy," placing particular emphasis on "Gross State Product ("GSP") . . . a barometer of 'growth of the state's economy' more consistent with sound economic practice and the intent of the constitutional and statutory provisions at issue."[8] They cited, and attached as evidence to their petition, comptroller projections and a study by former Hartland Bank chairman David Hartman that they contend demonstrate that GSP generally increases at a lower rate than SPI and that SPI consequently "overstates" state economic growth. Plaintiffs further argued that the legislative history of the proposed constitutional provisions that became article VIII, section 22 demonstrates affirmative intent to reject SPI as a measure of economic growth.[9]

Second, Plaintiffs alleged that the LBB's calculation of the SPI-based "estimated rate of growth in the state's economy" between the current and next biennium has "always" proven inaccurate when compared to the actual SPI growth rates for the same period. Plaintiffs complained that the legislature has not provided a "feedback mechanism" for making a "controlling reduction (or increase) in the growth numbers when the projections are in error" during either the subject biennium or after it ends, causing the spending cap (and appropriations) to grow at a rate exceeding

---

[8] Plaintiffs also urged that a measure based on population growth plus inflation would be more consistent with article VIII, section 22 than SPI.

[9] In their briefing in this proceeding, Plaintiffs summarize these theories as:

Theory Six—The use of SPI is unconstitutional, as it does not measure the "rate of growth of the state's economy."

Theory Seven—The use of SPI is unconstitutional, because the legislature explicitly rejected the use of SPI in the course of amending the legislation that became Article VIII, Section 22.

the actual rate of SPI growth.[10] It is undisputed that once the LBB adopts the SPI-based "estimated rate of growth of the state's economy" between the current and next biennium prior to the regular legislative session preceding the start of the next biennium, it does not adjust or revise that figure (or make corresponding adjustments to the spending cap) to account for intervening changes in economic conditions. Nor does chapter 316 require or provide a mechanism for making such adjustments. In contrast, it is undisputed that the LBB's staff will periodically revise the board's calculations of current-biennium appropriations from non-dedicated state tax revenues (with corresponding adjustments to the next biennium's spending cap) as the current biennium progresses and eventually ends. For example, in December 2005, after the 04-05 biennium ended and appropriations became final, the LBB staff calculated the actual level of 04-05 appropriations from non-dedicated state tax revenue to have been approximately $49.9 billion, a figure somewhat higher than the LBB's original estimate of $46.8 billion. Applying the fixed 11.34% economic growth rate to this final 04-05 appropriations amount, staff determined a final 06-07 spending cap that exceeded the LBB's original figure of $52.145 billion—approximately $55.6 billion.

---

[10] Plaintiffs summarize these theories as:

Theory Four—The State's use of SPI in combination with other factors is arbitrary and capricious because, while the state modifies the other factors as the biennium passes to account for actual historical data within the biennium, the state does not make such adjustments to SPI. Thus, when economic data indicate that the projected SPI is inaccurate (which, as noted above, it always has been), the projection is never adjusted for error.

Theory Five—State's use of SPI is arbitrary and capricious because, after the end of the biennium, the errors in SPI are never corrected for, unlike changes in other factors.

The effect of the unadjusted "excessive" appropriations resulting from deviations between estimated and actual SPI growth, Plaintiffs added, compounds each biennium, as past appropriations will necessarily be reflected in the current-biennium appropriations figure that is the baseline for the spending-cap calculation. As a result, Plaintiffs pled, Texas state government spending between 1980-81 and 2000-01 increased at a rate 42.2% greater than the actual rate of growth in SPI over the same period. The failure to correct for these past incremental deviations of actual versus estimated SPI growth and their compounding effect over time on each biennium's spending cap, Plaintiffs urged, violates article VIII, section 22.[11]

Third, Plaintiffs pled that the specific amount of appropriations from non-dedicated state tax revenues during the 06-07 biennium exceeded the spending cap. Plaintiffs cited calculations by LBB staff that total 06-07 appropriations from non-dedicated state tax revenues in December 2006 were $53.0 billion. This, Plaintiffs alleged, demonstrated that the legislature exceeded the spending cap—which, they contend, was $52.145 billion, the LBB's original 06-07 figure. Plaintiffs contended that the LBB staff's calculation of the final 06-07 spending cap—$55.6 billion—was invalid because it was not formally approved by the LBB itself. Alternatively, even assuming the validity of the $55.6 billion "unapproved staff generated limit,"

_____

[11] In other words, Plaintiffs advocated that article VIII, section 22 required *prospective* adjustments in the spending cap that account for past deviations between estimated and actual SPI growth. This is distinguishable from challenging "specific appropriations and expenditures made during prior biennia." *Hendee I*, 228 S.W.3d at 364 n.12.

Plaintiffs similarly pled a theory that article VIII, section 22 is violated by the failure to adjust each biennium's spending cap to account for past divergences between SPI and GSP or population-growth-plus-inflation. Because this theory rests upon Plaintiffs' contention that the use of SPI to estimate the economic growth rate violates article VIII, section 22, we do not separately address it.

10

Plaintiffs alleged that H.B. 1 appropriated an additional $3.9 million in non-dedicated state tax revenues—which, when added to the $53.0 billion already appropriated for 06-07, yielded $56.9 billion, $1.3 billion over the staff's own calculation of the cap.[12]

Fourth, Plaintiffs alleged that chapter 316 and the practices of making adjustments to the LBB's initial spending cap calculations violate the separation of powers by improperly delegating legislative power to the LBB, its staff, or the section 316.005 committee. Tex. Const. Ann. art. II, § 1. Relatedly, Plaintiffs urged that these violations render void any "adjustments" to the spending cap or current-biennium appropriation levels by LBB staff.[13]

---

[12] Plaintiffs term this theory "Theory One—The State overspent its own calculated limits."

[13] Plaintiffs summarize these theories as follows:

Theory Two—The State's SPI number was set at $52.145 and cannot be adjusted by LBB staff without express authorization of the ten-member Board of the LBB. . . .

Theory Three—The State's SPI number was set at $52.145 billion and cannot be adjusted by the LBB staff. Only the ten-member Board of the LBB can change the SPI number.

. . . .

Theory Eight—The Government Code Section 316.005 [committee comprised of the governor, lieutenant governor, speaker of the house of representatives, and comptroller that approves the LBB's initial calculation of the spending cap] facially violates the mandate in Article 2, Sec. 1 for separation of powers.

Theory Nine—The LBB has no constitutional authority to set the limit by itself. . . . [T]he LBB may propose a limit just as another committee may propose a bill, but the LBB's proposal must be ratified by the Legislature just like any other committee proposal. The failure of the Legislature to ever ratify the LBB's proposed limits is persuasive evidence of an unconstitutional delegation of authority.

Theory Ten—The LBB, as a committee, may not set the Article VIII, Section 22 limits, but can only recommend them to the Legislature, which must approve these limits "by general law" in accordance with the plain language of Article VIII, Section 22.

*Hendee I*

All defendants except the Comptroller[14] joined in a plea to the jurisdiction challenging only the sufficiency of Plaintiffs' pleadings. They argued that Plaintiffs' causes of action presented non-justiciable political questions and that Plaintiffs lacked standing as taxpayers to assert their causes of action, and that their causes of action were barred by sovereign immunity, because they had not and could not allege that H.B. 1's appropriation was actually unconstitutional or unlawful. The district court granted the plea without specifying its grounds. Plaintiffs appealed.

In *Hendee I*, relying on the Texas Supreme Court's analysis in *Neeley v. West Orange Cove-Consolidated Indep. Sch. Dist.*, 176 S.W.3d 746, 776-83 (Tex. 2005), we concluded that Plaintiffs' causes of action did not present non-justiciable political questions and, relatedly, that article VIII, section 22 was self-executing to the extent of prohibiting legislative action inconsistent with its requirements. *Hendee I*, 228 S.W.3d at 369-73. We also determined that Plaintiffs would have standing as state taxpayers to seek declaratory or injunctive relief challenging prospective state expenditures made pursuant to appropriations alleged to have violated article VIII, section 22(a) or chapter 316 of the government code. *Id.* at 378-82. We also emphasized, however, that the defendants could negate subject-matter jurisdiction over these causes of action by either demonstrating that Plaintiffs' pleadings did not allege facts constituting violations of article VIII, section 22 or chapter 316 or negating the existence of any such facts through conclusive jurisdictional evidence. *Id.* at 366-69 (citing *Texas Dep't of Parks & Wildlife v. Miranda*,

---

[14] At the time, Carole Keeton Strayhorn.

12

133 S.W.3d 217, 227-28 (Tex. 2004); *Director of Dept. of Agric. & Environ. v. Printing Indus. Ass'n*, 600 S.W.2d 264, 265-70 (Tex. 1980); *McLane Co. v. Strayhorn*, 148 S.W.3d 644, 649 (Tex. App.—Austin 2004, pet. denied)).[15] We held that the district court did not err in dismissing Plaintiffs' "improper delegation" causes of action because the face of their pleadings demonstrated fatal and incurable jurisdictional defects—namely, that the challenged procedures were not delegations of legislative power at all. *Id.* at 378.[16] On the other hand, observing that the defendants had not challenged in the trial court whether Plaintiffs had alleged article VIII, section 22 violations, nor had the parties developed that issue on appeal, we concluded that the district court would

---

[15] We explained:

It is . . . well-established that where a trial court's jurisdiction depends upon whether a state official's acts are within her constitutional or statutory authority, such as when a plaintiff alleges *ultra vires* action to avoid sovereign immunity, the trial court may sometimes be able to decide the jurisdictional issue as a matter of law based on the pleadings by construing the constitutional and statutory provisions defining the actor's authority and ascertaining whether the acts alleged would exceed that authority. *See, e.g.*, *McLane Co. v. Strayhorn*, 148 S.W.3d 644, 649 (Tex. App.—Austin 2004, pet. denied) (acknowledging that in determining whether declaratory judgment suit may be maintained against a state official, it was first necessary, in light of sovereign immunity principles, to construe statutes defining official's powers to "decide whether the [official] validly exercised her discretion or acted outside of her legal authority"); *cf. Director of Dept. of Agric. & Environ. v. Printing Indus. Ass'n*, 600 S.W.2d 264, 265-70 (Tex. 1980) (construing constitution to determine whether plaintiff alleged *ultra vires* action by state officials; state had raised issue via special exceptions). And *Miranda* would further allow jurisdictional challenges, via its summary judgment-like process, to the existence of the alleged acts that are asserted to have been beyond the actor's constitutional or statutory authority.

*Hendee I*, 228 S.W.3d at 368-69.

[16] We also held, sua sponte, that Plaintiffs had failed to allege C.L.O.U.T.'s associational standing, but that the defect was curable and Plaintiffs thus were entitled to the opportunity to amend. *See id.* at 382.

13

have abused its discretion in dismissing on that basis. *Id.* at 369, 374-75 (discussing *Miranda*, 133 S.W.3d at 227, and *Davis v. Burnham*, 137 S.W.3d 325, 335 & n.16 (Tex. App.—Austin 2004, no pet.)). Similarly, we rejected an appellate-level attempt by the defendants to broaden their jurisdictional challenge to attack the jurisdictional facts Plaintiffs pled in support of their cause of action that H.B. 1 "caused total appropriations [of non-dedicated state tax revenues for 06-07] to exceed even the unapproved staff-generated limit by $1.3 billion dollars." On appeal, the defendants had presented evidence for the first time that (1) before H.B. 1 was enacted, the Comptroller had certified additional constitutionally-dedicated tax revenue that caused the LBB staff's estimates of 06-07 appropriations from non-dedicated tax revenues to drop (correspondingly increasing the "room" under the spending cap); and (2) H.B. 1's appropriations from non-dedicated tax revenues, according to LBB staff calculations, fell within the spending cap. Nonetheless, we concluded that the principles of *Miranda* precluded us from considering this challenge when it overlapped with the merits of Plaintiffs' claims and was raised for the first time on appeal. *Hendee I*, 228 S.W.3d at 375-78.[17]

---

[17] We explained the principles underlying these holdings:

To succeed, a defendant challenging a jurisdictional fact via a plea to the jurisdiction must satisfy the same initial burden as in a "traditional" summary judgment—conclusively negating the existence of the fact—and judgment is proper in such instance only if the plaintiff cannot present controverting evidence raising a genuine issue of material fact. *Miranda*, 133 S.W.3d at 227-28. More generally, a trial court must exercise sound discretion in deciding whether a jurisdictional determination implicating the merits "should be made at a preliminary hearing or await a fuller development of the case, mindful that this determination must be made as soon as practicable." *Id.* at 227; *see Bland*, 34 S.W.3d at 554. It follows that a trial court's decision to determine a jurisdictional issue implicating the merits at a particular preliminary stage of case development may be so arbitrary or unreasonable,

Following our decision in *Hendee I*,[18] the defendants filed a petition for review in the supreme court, which was denied on July 10, 2007. With the August 31, 2007 end of the 06-07 biennium looming, Plaintiffs requested, and we granted, expedited issuance of our mandate.

**Proceedings below**

On July 31, 2007, Plaintiffs amended their petition to seek temporary and permanent injunctive relief, in addition to their original requests for declaratory relief.[19] All of the State Defendants[20] joined in a renewed plea to the jurisdiction, this time with attached evidence "to provide the record desired by the court of appeals." The State Defendants asserted: (1) *Hendee I* had already held that the district court lacked subject-matter jurisdiction over Plaintiffs' "improper delegation" causes of action; (2) Plaintiffs had failed to allege conduct constituting violations of article VIII, section 22(a); (3) their attached jurisdictional evidence conclusively established that 06-07 appropriations did not exceed the spending cap[21]; and (4) Plaintiffs' taxpayer standing was

---

given the state of the record, that it constitutes an abuse of discretion. *Cf. Davis v. Burnam*, 137 S.W.3d 325, 334-35 (Tex. App.—Austin 2004, no pet.) (vacating trial court's denial of jurisdictional plea turning on statutory construction to determine whether alleged acts were *ultra vires*; defendant had inadequate notice to brief and argue the issue).

*Hendee I*, 228 S.W.3d at 369.

[18] We issued our initial opinion and judgment in April 2007. The defendants filed a motion for rehearing, in response to which we substituted an opinion and judgment dated June 11, 2007.

[19] They also amended their allegations of C.L.O.U.T.'s associational standing.

[20] In the interim, Susan Combs had replaced Carole Keeton Strayhorn as Comptroller.

[21] This evidence included, along with the documents the defendants had attempted to present on appeal in *Hendee I*, affidavit testimony of John O'Brien, the Director of the LBB. O'Brien

15

destroyed, and their claims rendered moot, because the funds appropriated under 06-07 appropriations had already been spent (or would be, by the end of August).

On August 14, the district court granted the plea with regard to Plaintiffs' "improper delegation" claims but otherwise denied it. The State Defendants immediately filed a notice of appeal from the district court's order.[22] Apparently in response to the Plaintiffs' attempts to proceed with a hearing on their request for temporary injunctive relief, the State Defendants also filed a "Notice of Automatic Stay" in the district court stating that they were entitled to the automatic stay of trial court proceedings pending their appeal provided in section 51.014(b) of the civil practice and remedies code.[23] Plaintiffs filed an "Emergency Objection to State Defendants' Notice of Automatic Stay and Request for Reinstatement of Hearing Date on Plaintiffs' Request for Temporary Injunctive Relief." On August 21, the district court denied this relief, finding that the automatic-stay provisions

---

testified that the Comptroller's April 2006 update to the revenue estimates included an additional $1.8 million in natural gas tax revenue over the previous estimate. He explained that because natural gas revenues "are partially dedicated by the Constitution," total appropriations from non-dedicated state tax revenue as of April 2006 dropped to $52.04 billion, $3.56 billion under the spending limit. O'Brien continued that during the third special session of 2006, the legislature appropriated a total of $3.866 billion, $3.476 billion of which was funded by non-dedicated state tax revenues. Adding these new appropriations from non-dedicated state tax revenues to the $52.04 already appropriated would equal $55.516 billion, a figure below the 06-07 final spending cap of $55.6 billion.

O'Brien further testified that during its 80th regular session between January through May 2007, the legislature reduced 2007 appropriations and that further revisions to the comptroller's revenue estimates increased the amount of dedicated tax revenue, "thus freeing up revenue not subject to the spending limit." The effect of these developments, O'Brien opined, was to reduce total 06-07 appropriations from non-dedicated state tax revenues, as of July 2007, to $55.3 billion, or $286 million below the 06-07 final spending cap.

[22] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8).

[23] *See id.* at § 51.014(b).

16

of section 51.014(b) applied. On August 23, Plaintiffs sought mandamus relief from this order, which we granted to the extent of holding that section 51.014(b)'s automatic-stay provisions did not apply during the pendency of the State Defendants' pending interlocutory appeal.[24] The State Defendants sought mandamus from this order with the supreme court, which denied such relief on August 30.[25] At the end of the following day, August 31, 2007, the 06-07 biennium ended.

During the pendency of this appeal, Plaintiffs have filed a second amended petition in which they add declaratory and injunctive claims seeking to prevent forthcoming expenditures under 08-09 appropriations that they allege are unconstitutional and illegal. Plaintiffs base these claims, as before, on the theories that the underlying 08-09 appropriations violate article VIII, section 22 because of the legislature's continued use of SPI to calculate the spending cap and the lack of a "feedback" mechanism as it bears on that cap's calculation.[26] Plaintiffs also add a new cause of action alleging that the specific amount of 08-09 appropriations from non-dedicated state tax revenues exceeds the 08-09 spending cap.

## DISCUSSION

The State Defendants bring four issues on appeal, contending that Plaintiffs have failed to invoke the district court's subject-matter jurisdiction because (1) the alleged facts made the

---

[24] *In re Hendee*, No. 03-07-00490-CV (Tex. App.—Austin Aug. 27, 2007) (mem. op.).

[25] *In re Dewhurst*, No. 07-0683 (Tex. Aug. 30, 2007). The parties represent that the district court subsequently denied Plaintiffs' request for temporary injunctive relief.

[26] They similarly complain of the continued "improper delegation" of powers to the LBB, its staff, and the section 316.005 committee, albeit acknowledging that *Hendee I* affirmed the dismissal of those causes of action.

17

basis for Plaintiffs' theories challenging the use of SPI and the lack of a "feedback mechanism" in calculating the spending cap do not constitute violations of article VIII, section 22(a); (2) the State Defendants' uncontroverted jurisdictional evidence conclusively demonstrates that 06-07 from non-dedicated state tax revenues did not exceed the 06-07 spending cap; (3) Plaintiffs lack standing as taxpayers because the 06-07 biennium has ended and, by definition, all expenditures under the challenged 06-07 appropriations have already been spent; and (4) similarly, Plaintiffs' causes of action challenging 06-07 appropriations or expenditures are moot.[27]

The applicable standard of review is detailed in *Hendee I.*  228 S.W.3d at 366-69.

**Standing and mootness**

We agree with the State Defendants that the expiration of the 06-07 fiscal biennium is fatal to Plaintiffs' standing as taxpayers to seek declaratory and injunctive relief to prevent expenditures under 06-07 appropriations.  Those appropriations, by definition, expired after August 31, 2007.  *See Hendee I*, 228 S.W.3d at 359-60 & n.3.  Stated another way, the allegedly illegal expenditures that conferred standing on Plaintiffs to challenge 06-07 appropriations have already been spent.[28]  And, as we observed in *Hendee I,*

---

[27]  The State Defendants do not separately challenge C.L.O.U.T.'s associational standing, relying on the above grounds to defeat the standing of its members to sue in their own behalf.  *See Texas Ass'n of Bus. v. Tex. Air Control BD.*, 852 S.W.2d 440, 447 (Tex. 1993).

[28]  At oral argument, counsel for Plaintiffs asserted that their standing to challenge 06-07 appropriations might have been preserved because some appropriated funds "lapse" at the end of a biennium without being spent and go back into general revenue.  Although any such funds would now be subject to appropriation in the current (08-09) biennium, counsel maintained that such funds could, at least in theory, not yet be spent.  For this reason, counsel posited, Plaintiffs would retain standing even into the 08-09 biennium to challenge the legality of the 06-07 appropriations under which those funds could have been expended during that biennium, but ultimately were not.

it is well-established that taxpayers have standing only to challenge *prospective* state expenditures, but do not have standing to complain of public funds that have already been spent. As the supreme court has explained:

> When a taxpayer brings an action to restrain the illegal expenditure . . . of tax money he sues for himself, and it is held that his interest in the subject-matter is sufficient to support the action; but when the money had already been spent, an action for its recovery is for the [taxing entity]. The cause of action belongs to it alone.

*Hoffman v. Davis*, 100 S.W.2d 94, 95 (Tex. 1937); *see Bland* [*I.S.D. v.Blue*], 34 S.W.3d [547,] 556-58 [(Tex. 2000)].

*Hendee I*, 228 S.W.3d at 381. These limitations reflect that "[i]n general, taxpayers do not have a right to bring suit to contest government decision-making because . . . governments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under review." *Bland*, 34 S.W.3d at 555 (quoting *Osborne v. Keith*, 177 S.W.2d 198, 200 (Tex. 1944)). Taxpayer-standing principles strike a balance between "the protection afforded taxpayers" by permitting such suits compared to "the interference such suits pose to government activities." *Id*. at 557. Applying these principles, the Texas Supreme Court has held that taxpayers lack standing to challenge even prospective expenditures when "the government entity has received all that it bargained for and must simply pay for it," because "[t]he potential for disruption of government operations is too great to allow a

---

Eventually, Plaintiffs' counsel candidly conceded that this argument was "not the strongest part of our case." We are not persuaded that the existence of any lapsed appropriated 06-07 funds could, in light of the well-established principles of taxpayer standing discussed above, somehow preserve Plaintiffs' standing to seek declaratory and injunctive relief to challenge the now-expired 06-07 appropriations.

taxpayer with no special injury distinct from the general public from paying for goods and services it has already received and placed in permanent use." *Id.* at 381-82. Where the challenged expenditures have already been made, taxpayers even more clearly lack standing to seek injunctive and declaratory relief to prevent those expenditures. *Hendee I*, 228 S.W.3d at 364 ("To the extent Plaintiffs are complaining about specific appropriations and expenditures made during prior biennia, as opposed to forthcoming expenditures . . . they would lack standing."); *see Hoffman*, 100 S.W.2d at 95. Consequently, we must reverse the district court's order with regard to Plaintiffs' declaratory and injunctive claims against expenditures under now-expired 06-07 appropriations and render judgment dismissing those claims for want of subject-matter jurisdiction. *See Koseoglu*, 233 S.W.3d at 839-40.[29]

Similarly, each cause of action that Plaintiffs have asserted to challenge 06-07 appropriations has been rendered moot by the 06-07 biennium's expiration. This includes Plaintiffs' theory that the specific amount of 06-07 appropriations exceeded the spending cap applicable to that biennium. Plaintiffs attempt to salvage this theory by invoking the "capable of repetition, yet evading review" exception to the mootness doctrine. To invoke this exception, a plaintiff must prove that: (1) the challenged action was too short in duration to be litigated fully before the action ceased or expired; and (2) a reasonable expectation exists that the same complaining party will be subjected to the same action again. *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001); *Blum v. Lanier*, 997 S.W.2d 259, 264 (Tex. 1999); *see also In re Allied Chem. Corp.*, 227 S.W.3d

---

[29] We note that the 06-07 biennium had not yet expired at the time the district court ruled on the State Defendants' plea to the jurisdiction.

20

652, 655 (Tex. 2007). Even if this mootness exception were otherwise availing here, it remains that the 06-07 biennium has ended, all 06-07 appropriations have expired, and there cannot possibly be further allegedly illegal expenditures under those appropriations that would give Plaintiffs standing to challenge those appropriations. *See Hoffman*, 100 S.W.2d at 95.[30]

On the other hand, Plaintiffs' second amended petition, as noted, seeks declaratory and injunctive relief to prevent forthcoming expenditures under 08-09 appropriations based on their live theories that the continued use of SPI to calculate "the estimated rate of growth of the state's

---

[30] Because Plaintiffs have not alleged a justiciable controversy regarding compliance with the 06-07 spending cap that would continue beyond the 06-07 biennium's end, any opinion we would offer on that subject or the implications of the State Defendants' jurisdictional evidence would be advisory and beyond our jurisdiction. *See Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000) ("Under article II, section 1 of the Texas Constitution, courts have no jurisdiction to issue advisory opinions."). We note, however, that Plaintiffs have relied on their "improper delegation" theories in urging us to ignore the State Defendants' jurisdictional evidence regarding the LBB staff's calculations of the final 06-07 spending cap and of the level of appropriations from non-dedicated state tax revenues as the 06-07 biennium progressed. Because Plaintiffs have not appealed from the district court's dismissal of their improper delegation theories below, any challenge to that ruling is not properly before us. *See Campbell v. State*, 85 S.W.3d 176, 184 (Tex. 2002). To the extent Plaintiffs nevertheless are asking us to revisit our holding in *Hendee I* that their improper delegation claims failed to state violations of article II, section 1, we decline that invitation. *See Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003) (discussing the law-of-the-case doctrine); *cf. Tex. Parks & Wildlife Dep't v. Dearing*, 240 S.W.3d 330, 351 (Tex. App.—Austin 2007, pet. filed) (finding that "clearly erroneous" exception to law-of-the-case doctrine applied). However Plaintiffs might attempt to characterize the actions of the LBB, its staff, or the section 316.005 committee in regard to the spending cap, it remains that "the ultimate legislative power—whether a bill containing an appropriation is passed, amended, or rejected—is vested not in the LBB or its staff, but with each respective chamber and its individual members, who can utilize several procedural mechanisms to resist passage of bills containing appropriations they believe would violate the spending cap." *Hendee I*, 228 S.W.3d at 378 (also observing that "the only 'delegation' of legislative power that Plaintiffs attack is merely an assignment of duties within the legislative branch."). Further, because this holding is decisive of all of Plaintiffs' improper-delegation theories, we need not address the State Defendants' contention that Plaintiffs waived their complaint regarding the committee established under section 316.005. *See id.* at 365 n.13.

economy" and the spending cap and the absence of a "feedback mechanism" violate article VIII, section 22. *See City of Austin v. L.S. Ranch, Ltd.*, 970 S.W.2d 750, 755 (Tex. App.—Austin 1998, no pet.) (petition was amended during pendency of interlocutory appeal from denial of plea to jurisdiction to allege justiciable controversy and moot subject matter of appeal). Plaintiffs also allege a new theory that the specific amount of the legislature's 08-09 appropriations from non-dedicated state tax revenue have exceeded the 08-09 spending cap.

Because the State Defendants have not challenged subject-matter jurisdiction over the latter theory in this proceeding, that question is not yet before us. However, the State Defendants have squarely challenged whether the legislature's use of SPI and the absence of a "feedback mechanism" actually constitute violations of article VIII, section 22. *See Hendee I*, 228 S.W.3d at 374 (whether conduct constituting a constitutional violation has been alleged controls both sovereign immunity and Plaintiffs' standing). Because these grounds would negate subject-matter jurisdiction over Plaintiffs' live claims based on those theories, we consider them here. *Id.* at 368-69.

**Use of SPI**

The parties agree that to prevail on their causes of action regarding the legislature's use of SPI to determine "the estimated rate of growth of the state's economy," Plaintiffs must plead and prove that such use is arbitrary in light of the requirements of article VIII, section 22. Arbitrariness is the standard that the supreme court has applied to claims challenging the Texas public school finance system under article VII, section 1, of the Texas Constitution. *See Neeley*, 176 S.W.3d at 783-85. An action is arbitrary when it is taken without reference to

22

guiding rules or principles. *Id.* at 784 (citing *General Tire, Inc. v. Kepple*, 970 S.W.2d 520, 526 (Tex. 1998)). Whether a legislative enactment is arbitrary is a question of law that we review de novo. *Neeley*, 176 S.W.3d at 785. Although this determination may rest in part upon determinations of disputed factual matters, such findings "have a limited role" in deciding ultimately the constitutional issues. *Id.*

Both article VII, section 1 and article VIII, section 22 mandate that the legislature enact legislation to effectuate somewhat broadly-defined goals, yet do not specify precisely how the legislature is to perform that task. *Compare* Tex. Const. Ann. art. VII, § 1 ("A general diffusion of knowledge being essential to the preservation of the liberty and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of free public schools") *with id.* art. VIII, § 22(a) ("In no biennium shall the rate of growth of appropriations from state tax revenues not dedicated by this constitution exceed the estimated rate of growth of the state's economy. The legislature shall provide by general law procedures to implement this subsection."). In this way, each provision "gives the legislature the 'sole right to decide how to meet the standards set by the people,'" yet it remains under our constitution that "the Judiciary has the final authority to determine whether they have been met." *Hendee I*, 228 S.W.3d at 373 (quoting *Neeley*, 176 S.W.3d at 777 & n.169 (quoting *West Orange-Cove Consol. Indep. Sch. Dist. v. Alanis*, 107 S.W.3d 558, 563-64 (Tex. 2003))); *see also id.* at 372 (legislature's authority is "not committed unconditionally to the legislature's discretion, but is instead accompanied by standards") (quoting *Neeley*, 176 S.W.3d at 776-77 (quoting *Edgewood Indep. School Dist.* v. *Kirby*, 777 S.W.2d 391, 394

23

(Tex. 1989))).[31]  The arbitrariness standard ensures that the judiciary defers to the legislature on matters constitutionally committed to that branch's discretion while also performing its role as final arbiter of whether the legislature's acts comply with constitutional requirements.  As the supreme court has explained in regard to article VII, section 1:

> If the Legislature's choices are informed by guiding rules and principles properly related to public education—that is, if the choices are not arbitrary—then the system does not violate the constitutional provision.
>
> For article VII, section 1, as with other provisions, "[t]he final authority to determine adherence to the Constitution resides with the Judiciary."  As we have said, "'a mere difference of opinion [between judges and legislators], where reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable.'"  At the same time, "[l]egislative action . . . is not without bounds."  In assessing challenges to the public school system under article VII, section 1, courts must not on the one hand substitute their policy choices for the Legislature's, however undesirable the latter may appear, but must on the other hand examine the Legislature's choices carefully to determine whether those choices meet the requirements of the Constitution.  By steering this course, the Judiciary can assure that the people's guarantees under the Constitution are protected without straying into the prerogatives of the Legislature.

*Neeley*, 176 S.W.3d at 785 (footnotes and citations omitted).  Similarly, when evaluating whether Plaintiffs have alleged conduct constituting violations of article VIII, section 22(a), it is not enough for Plaintiffs to allege merely that the legislature might have chosen a better method for calculating the spending cap or to demonstrate a "difference of opinion . . . where reasonable minds could differ." *See id.*  Our proper role is instead to determine whether the legislature's choice of a method

---

[31]  *See also Mitchell County v. City Nat'l Bank*, 43 S.W.3d 880, 882-83 (Tex. 1898) (constitutional provisions were self-executing to the extent of prohibiting conflicting laws but not to the extent of requiring particular laws be enacted to effectuate it because the provisions "prescribe no rules by which any act could be done in the enforcement of their requirements").

is *arbitrary*—without guiding rules and principles properly related to the directives of article VIII, section 22. *See id.*[32]

Given these limitations on judicial intervention, Plaintiffs' theory ultimately must rest upon a construction of article VIII, section 22 that forecloses any discretion of the legislature to choose the rate of growth of SPI to measure "the estimated rate of growth in the state's economy." Plaintiffs urge that the "estimated rate of growth of the state's economy" in article VIII, section 22(a) means growth of the *entire* economy—and personal income is inadequate because it is merely one *component* of the state's economy. To further support their analysis of the provision's text, Plaintiffs also rely on a view of article VIII, section 22's legislative history. As introduced in the house of representatives, the proposed Tax Relief Amendment that included what became article VIII, section 22 would have limited the growth of all legislative appropriations from state tax revenue to a fixed annual increase of 7½ percent. H.J. of Tex., 65th Leg., 2d C.S. 9 (1978). That provision was deleted entirely in the committee substitute, *see id*. at 92, but the following provision was later added through a house floor amendment:

---

[32] As we have previously suggested, the same standard would apply to a complaint that the specific spending cap for a biennium has been exceeded—whether the legislature acted arbitrarily in regard to its compliance with that limit. *See Hendee I*, 228 S.W.3d at 378 n.29. This standard leaves room for "difference of opinion" regarding the technical calculations and economic forecasting bearing on the spending cap and its components and legislative ascertainment of whether current-biennium appropriations from non-dedicated state tax revenues are within the cap. *See id.* (observing, with regard to Plaintiffs' claim alleging violation of the 06-07 spending cap as calculated by the LBB staff, "Plaintiffs would not have a basis to 'go behind' and dispute estimates validly made by the Comptroller or LBB."). On the other hand, this standard does not require or allow *carte blanche* judicial deference to bare conclusions by the State's witnesses regarding what these figures are or whether the spending cap has been complied with.

25

That Article VIII of the Texas Constitution be amended by adding Section 21 to read as follows:

Sec. 21 (a) Except as otherwise provided by this Section, legislative appropriations from State tax revenue for a fiscal biennium may not exceed the total of those appropriations for the preceding biennium by more than would result from a percentage equaling the percentage of growth of total personal income of the State during the previous biennium, as reported by the Comptroller of Public Accounts.

(b) The limitation in subsection (a) hereof shall not apply to appropriations and tax increases necessary to provide for reimbursement to school districts to replace revenues lost by partial or total abolition of ad valorem property taxes.

(c) If the legislature by adoption of a resolution approved by a record vote of three-fifths of the members of each house, finds that an emergency exists and identifies the nature of the emergency, the legislature may provide for appropriations in excess of the amount authorized by Subsection (a) of this section. The excess authorized under this subsection may not exceed the amount specified in the resolution.

(d) In no case shall appropriations exceed revenues as provided in Article III, Section 49a.

*Id*. at 142-43. This version of the provision that became article VIII, section 22 remained in the Taxpayer Relief Amendment passed by the house, *id*., but was deleted in the senate committee substitute and omitted from the version approved by that chamber. *Id*. at 309. The conference committee agreed on the language that now appears in article VIII, section 22, and that was the version submitted to and ratified by the voters. Citing the fact that the legislature considered but eventually rejected a version of subsection (a) that would have explicitly tied the spending limit to growth in personal income, Plaintiffs urge us to infer legislative intent to reject growth in personal income as a measure of the "estimated rate of growth in the state's economy."

26

When construing the Texas Constitution, we "rely heavily on its literal text and must give effect to its plain language." *Stringer v. Cendant Mortgage Corp*., 23 S.W.3d 353, 355 (Tex. 2000); *see Republican Party of Tex. v. Dietz*, 940 S.W.2d 86, 89 (Tex. 1997); *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 394 (Tex. 1989). We strive to give constitutional provisions the effect their makers and adopters intended. *Stringer*, 23 S.W.3d at 355. To that end, we may also consider such things as the legislative history and purpose of the constitutional provision, the historical context in which it was written, prior judicial decisions, and the interpretations of analogous constitutional provisions by other jurisdictions. *Id.*; *Dietz*, 940 S.W.2d at 89.

Contrary to Plaintiffs' assertions, the text of article VIII, section 22(a) does not foreclose the legislature's use of SPI to calculate the "estimated rate of growth of the state's economy." The meaning of the terms "the state's economy" and "the estimated rate of growth of the state's economy" is not self-apparent, but entails consideration of myriad technical and policy variables. *Cf. Neeley v. West Orange-Cove Consol. Indep. Sch. Dist*., 176 S.W.3d 746, 783 (Tex. 2005) (noting that "the standards of article VII, section 1 —adequacy, efficiency, and suitability—do not dictate a particular structure that a system of free public schools must have"). Nor does article VIII, section 22 provide definitions for these terms.[33] Instead, the provision expressly contemplates that the legislature will address these matters in the first instance when devising "procedures to implement this subsection." Tex. Const. Ann. art. VIII, § 22(a). We cannot

---

[33] Nor do Plaintiffs point to any other constitutional provisions or case law that might bear upon judicial construction of these terms.

conclude that the legislature's determination to select SPI as the basis for calculating the growth factor was without guiding rules and principles relative to article VIII, section 22(a)'s purposes.

The State Defendants have advanced several reasonable rationales supporting the legislature's choice to use SPI. They urge that personal income is an appropriate measure of state spending relative to economic growth—the concern of article VIII, section 22—because it measures the ability of individuals and businesses to pay for government services.[34] The State Defendants also observe that twenty out of thirty states with spending limits use personal income to measure economic growth. They further posit that using SPI also has the economic policy benefit of incentivizing stakeholders in government spending to support policies that increase personal income. Plaintiffs vehemently disagree with these economic and policy judgments, offering their own rationales as to why GSP or other alternatives would provide a more accurate or fiscally prudent barometer of economic growth than SPI. Although these arguments may demonstrate that reasonable minds can disagree with the legislature's choices, we cannot conclude that the use of SPI is so lacking in guiding rules and principles related to article VIII, section 22's directives as to be arbitrary and unconstitutional.

We are unpersuaded by the implications Plaintiffs draw from article VIII, section 22's legislative history. That the legislature considered but ultimately decided not to include express language in the constitutional proposal that would have tied the spending cap to personal income is merely one indicator of the intent of that provision. *See Stringer*, 23 S.W.3d at 355 (observing that the intent of both the drafters *and* the people who ratified it is relevant). More importantly, this

---

[34] These rationales are detailed in O'Brien's affidavit testimony.

legislative record is at least equally consistent with the contemporary practice of constitutionalizing only the general principles of the limitation, delegating to the legislature the task of determining the specific method of calculating the estimated economic growth rate and spending cap, and thereby avoiding adding even more statute-like provisions to the byzantine array already contained in our 130-year-old Texas Constitution.

If anything, the origins of section VIII, section 22 support the legislature's choice to use SPI to measure the estimated rate of growth in the state's economy. As we noted in *Hendee I*, article VIII, section 22 was born of a tax reform effort in the late 1970s. *See* John Greene & Larry Toomey, *The Tax Reform Act of 1979*, 42 Tex. B.J. 1007, 1007 (1979) (contemporaneously observing, with reference to the notable California taxpayer-relief measures of the 1970s, that "Proposition 13 sentiment has invaded the Texas Legislature."). The provision that became article VIII, section 22 was one of several components of a "Tax Relief Amendment" to the constitution proposed by the 65th legislature during a special session called for that purpose by Governor Dolph Briscoe. H.J.R. 1, 65th Leg., 2d C.S. These origins suggests less a concern with the general growth in government compared to the economy that Plaintiffs decry, but with the relative burdens that the funding demands of government impose on taxpayers. The legislature would not have acted arbitrarily and without guiding rules and principles by seeking to advance this objective by tying growth in state spending to growth in the income of the taxpayers who fund the government.

For these reasons, we hold that Plaintiffs' theory that the legislature's use of SPI to calculate "the estimated rate of growth in the state's economy" and the spending cap does not allege conduct constituting a violation of article VIII, section 22.

**Adjustment mechanism**

We also cannot conclude that the legislature's failure to provide a "feedback" mechanism to reconcile estimated SPI growth with actual SPI growth during the biennium violates article VIII, section 22. Article VIII, section 22(a) requires only that the rate of growth in appropriations cannot exceed "*the estimated* rate of growth in the state's economy." "*The* estimated rate of growth" implies a single calculation, while "*estimated* rate of growth" belies Plaintiffs' notion that the figure must precisely track whatever the actual rate of SPI growth during the biennium ultimately proves to be. Nor did the legislature act arbitrarily in requiring the LBB and section 316.005 committee to develop and approve this estimate before the legislature's regular session. This timing enables the LBB to make an initial calculation of the next biennium's spending cap before the legislature begins the session in which it generally will enact appropriations for that biennium.

Plaintiffs emphasize that, in contrast to the legislature and LBB's reliance on a fixed estimated economic growth rate, the LBB staff periodically updates the board's calculations of current-biennium appropriations and makes corresponding adjustments to the next biennium's spending cap, including a final calculation of the spending cap once the current biennium ends. Plaintiffs urge that this distinction establishes the arbitrariness of using a fixed economic growth estimate. To the contrary, this distinction is consistent with the text of article VIII, section 22. Although the provision refers to "the *estimated* rate of growth of the state's economy," the framers did not similarly qualify "the rate of growth of appropriations from state tax revenues not dedicated by this constitution." Consequently, article VIII, section 22(a) would appear to require that the rate

of growth of *actual* appropriations from non-dedicated state tax revenues not exceed "the estimated rate of growth of the state's economy" for that period. The LBB staff's periodic recalculations of the amount of current-biennium appropriations from non-dedicated state tax revenues (and corresponding adjustments to the next biennium's spending cap) would appear necessary to ensure that the rate of growth in actual appropriations remains within the estimated rate of growth of the state's economy. There is no corresponding constitutional basis for requiring similar adjustments to the economic growth rate. The legislature's failure to provide for such adjustments is not arbitrary.

Similarly, we cannot conclude that the absence of mechanisms for accounting for long-term deviations between estimated and actual SPI growth constitutes a violation of article VIII, section 22. The provision, again, refers to "the *estimated* rate of growth in the state's economy" for the biennium and does not require that appropriations growth precisely track whatever ultimately proves to have been the actual rate of SPI growth once the period ends. To the extent that Plaintiffs are challenging the legislature's use of a biennium-by-biennium method of calculating the spending cap—calculating economic and appropriations growth from a base year of the current biennium[35] instead of using a baseline like 1980-81 or earlier years that would tend to correct incremental biennial deviations—we likewise conclude that Plaintiffs have not alleged a theory whereby that

---

[35] *See* Tex. Gov't Code Ann. § 316.002(a) (requiring the LBB to establish "the estimated rate of growth of the state's economy *from the current biennium to the next biennium*," "the level of appropriations *for the current biennium* from state tax revenues not dedicated by the constitution," and "the amount of state tax revenues not dedicated by the constitution that could be appropriated *for the next biennium* within the limit established by the estimated rate of growth of the state's economy").

31

approach would violate article VIII, section 22. Article VIII, section 22(a) provides that, "*[i]n no biennium* shall the rate of growth of appropriations from state tax revenues not dedicated by this constitution exceed the estimated rate of growth of the state's economy." This type of provision allows either a biennium-by-biennium approach or a comparison of relative economic and spending growth between the provision's inception and the next biennium. *Cf.* Op. Tenn. Atty Gen. 85-153, at 5 (1985) (observing that Tennessee's similar constitutional limitation could be implemented either by taking its year of inception as the base year or by looking only to the preceding year).[36] Consequently, we cannot conclude that the legislature acted without guiding rules and principles in opting for its biennium-by-biennium approach.

In sum, although reasonable minds may differ regarding the policy choices the legislature has made in its implementation of article VIII, section 22, we cannot conclude that the choices of which Plaintiffs have complained violate constitutional boundaries. Plaintiffs' complaints regarding those policy choices, in other words, must be adjudged not by the judiciary but by the legislature and, ultimately, the people.

## CONCLUSION

For the foregoing reasons, we reverse the district court's order in part, and render judgment dismissing all of Plaintiffs' causes of action for want of jurisdiction, with the exception

---

[36] Tenn. Const. Ann. art. II, § 24 ("In no year shall the rate of growth of appropriations . . . exceed the estimated rate of growth of the state's economy. . . "). This provision apparently was the model for article VIII, section 22. *See* Janice C. May, *The Texas State Constitution: A Reference Guide* 310 (1996).

32

of their claims, added in their second amended petition, based on the yet-unchallenged theory that the specific amount of 08-09 appropriations from non-dedicated state tax revenues have exceeded the 08-09 spending cap.

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton

Reversed and Rendered

Filed:   April 2, 2008