

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

## No. 02-18-00390-CV
_____

KIMBERLY WITT, DECEASED, FE SANTISTEVAN, DECEASED, JIMMIE
SANTISTEVAN, SARAH SANTISTEVAN, GWYNNETH HENNIS, GARRETH
GERMONO, GERMAINE GERMONO, ALEXANDRA WITT, CHRISTINA
COREY, ELLEN POTTHAST, AND BENITA DE GUZMAN, Appellants

V.

MICHELIN NORTH AMERICA, INC. AND BF GOODRICH, IN ITS ASSUMED
OR COMMON NAME, Appellees

On Appeal from the 43rd District Court
Parker County, Texas
Trial Court No. CV14-1833

Before Gabriel, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Kimberly Witt and Fe Santistevan were tragically killed in a traffic accident in 2014. As relevant here, their estates and family members—the Appellants—filed a products liability action against appellee Michelin North America, Inc. In five issues, Appellants challenge the take-nothing judgment in favor of Michelin. We resolve a majority of these issues in Michelin's favor. However, we agree with Appellants that the trial court abused its discretion by sealing a certain set of records. We therefore affirm in part and reverse and render in part.

## I. BACKGROUND

On June 25, 2014, Jennifer Cristantielli was driving on a highway outside of Granbury, Texas, when the tread on her Michelin tire separated.[1] The tread separation caused her truck to swerve across the grassy median into oncoming traffic, striking the vehicle in which Witt and Santistevan were traveling. Santistevan died at the scene, and Witt died at the hospital.

---

[1] Portions of the record were filed under seal pursuant to the trial court's sealing order. *See* Tex. R. Civ. P. 76a. Because of the sealing order, some of our references to the record are "deliberately vague." *See TMX Fin. Holdings, Inc. v. Wellshire Fin. Servs., LLC*, 515 S.W.3d 1, 4 n.1 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd); *Kartsotis v. Bloch*, 503 S.W.3d 506, 510 (Tex. App.—Dallas 2016, pet. denied) (op. on reh'g). Nonetheless, we have a responsibility to resolve disputes through public opinions that explain our decisions based on the record. *See* Tex. R. App. P. 47.3. "To the extent we include any sensitive information in this memorandum opinion, we do so only to the degree necessary to strike a fair balance between the parties' interest in keeping portions of the record confidential and our responsibilities to the public as an appellate court." *TMX*, 515 S.W.3d at 4 n.1.

Appellants filed suit against Cristantielli and the company she was working for, Morgans of Briar Oaks, LLC. Appellants also sued Michelin, alleging that the failed tire on Cristantielli's truck was defective from design, manufacturing, and marketing standpoints. Appellants further alleged that Michelin was grossly negligent in designing and manufacturing the failed tire.

Appellants sought to bring five defect theories before the jury through the expert testimony of Troy Cottles. At Michelin's urging, the trial court excluded two of Cottles's defect theories as unreliable. Appellants went to trial on the three remaining defect theories.

For its part, Michelin contended that the tire was not defective. Instead, Michelin argued that the tread separation was caused by poor maintenance and improper use by the truck's owner, Morgans of Briar Oaks.

The parties conducted a hard-fought, two-week trial in which they thoroughly covered Michelin's production process, the supposed defects, and the accident itself. After the close of Appellants' case, the trial court granted a directed verdict on Appellants' gross-negligence claim. The jury found that the tire was not defective, but that Morgans of Briar Oaks was negligent in maintaining the tire, and that this negligence was 100% to blame for causing the decedents' deaths. As damages, the jury awarded funeral expenses of $9,569.94 for Witt and $1,922 for Santistevan. Appellants appealed.

## II.    EXCLUSION OF EXPERT TESTIMONY

In their first issue, Appellants challenge the order preventing their expert, Troy Cottles, from testifying as to two alleged defects in the tires: belt irregularities and liner pattern marks. The trial court agreed with Michelin's argument that Cottles had not demonstrated a reliable foundation for these theories. Appellants assert that the content of Cottles's eighty-page affidavit should have been more than sufficient to establish the reliability of his proposed testimony.

"Qualified experts may offer opinion testimony if that testimony is both relevant and based on a reliable foundation." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 348 (Tex. 2015). "To be relevant, the proposed testimony must be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *E.I. du Pont de Nemours & Co., v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995) (internal quotation marks omitted). Expert testimony is reliable if it meets the *Robinson* factors, *see id.* at 557, or if the trial court can otherwise assess its reliability, *see Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). The six non-exclusive *Robinson* factors are

(1)    the extent to which the theory has been or can be tested;

(2)    the extent to which the technique relies upon the subjective interpretation of the expert . . . ;

(3)    whether the theory has been subjected to peer review and/or publication;

(4)    the technique's potential rate of error;

4

(5)     whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6)     the non-judicial uses which have been made of the theory or technique.

*Robinson*, 923 S.W.2d at 557.

Expert testimony is unreliable if there is too great an analytical gap between the data on which the expert relies and the opinion offered. *Gharda*, 464 S.W.3d at 349. "Whether an analytical gap exists is largely determined by comparing the facts the expert relied on, the facts in the record, and the expert's ultimate opinion." *Id.* The trial court has broad discretion to determine admissibility, and we will reverse only if there is an abuse of that discretion. *Helena Chem.*, 47 S.W.3d at 499. To gauge reliability, we evaluate "the *methods, analysis, and principles* relied upon in reaching the opinion." *Id.* (emphasis added) (quoting *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 725 (Tex. 1998)).

To begin, Michelin does not dispute Cottles's qualifications, which were considerable. Nor does Michelin dispute Cottles's general method of evaluating the case, in which he inspected the physical condition of the failed tire using a microscope and x-rays, compared its qualities to benchmarks for damage and abnormalities, and worked backward from the tire's characteristics to reach an opinion as to what had gone wrong. Michelin's expert employed much the same method.

Rather, on appeal, Michelin only disputes the reliability of the analysis and principles that Cottles advanced in support of his defect theories. According to

5

Michelin, Cottles's affidavit offered little support for his theories that the tire suffered from "belt irregularities" and "liner pattern marks" that materially contributed to its failure. Michelin attacked the sources that Cottles drew upon in support of these theories, and Michelin offered excerpts from Cottles's depositions that also tended to undercut his proposed testimony. The trial court ruled in favor of Michelin. To assess whether the trial court abused its discretion, we examine the record, especially Cottles's affidavit.

In his affidavit, Cottles opined that he observed multiple forms of belt irregularities in the failed tire, including abnormally spaced belt cables, off-centered placement of the belt, and "dog-eared splices."[2] According to Cottles, these irregularities contributed to heat generation and stress within the failed tire, particularly at the edges of the belts where the tread separation occurred. Cottles attested that these irregularities were manufacturing defects resulting from a poorly controlled production process. In Cottles's view, the poor placement and splicing of the belts were significant contributing factors in causing the tire's tread to separate.

To bolster this hypothesis, Cottles cited multiple sources stating that "manufacturing variances," in general, may contribute to tire failure. Because of their

---

[2]While Cottles explained a great deal about the tire production process, he did not explain exactly what a dog-eared splice was. Based on the whole of his affidavit, it appears that a dog-eared splice may be some sort of misplacement that results when various components of the tire are inexactly joined together during the initial stages of the production process.

generality, the trial court might have fairly believed that these sources supported Cottles's theory only in a loose sense.

Cottles cited just one source, an article by Jill Bartel, that directly supported his theories concerning the specific irregularities he found in the failed tire. However, Cottles agreed at his deposition that he did not know if Bartel was an engineer, what her qualifications were, or whether her article was peer-reviewed. Cottles further conceded that he was not aware of any testing or peer-reviewed literature that might support his belt-irregularity theory.[3] By contrast, he agreed that there were some testing and published, peer-reviewed papers that went against his premise.

In the absence of any peer-reviewed support, Cottles testified that he ultimately rested his opinion on his "training and experience in the industry." But "in very few cases will the evidence be such that the trial court's reliability determination can properly be based only on the experience of a qualified expert." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009).

Moreover, while Cottles argued that manufacturing variance may contribute to tire failure, he agreed that all of the irregularities he found in the tire were within Michelin's specifications. To qualify as a manufacturing defect, the product must deviate from its specifications or planned output in a manner that renders the product unreasonably dangerous. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 41 (Tex. 2007). To

---

[3]Michelin also produced a deposition from another case in which Cottles admitted that he had not tested his belt-irregularity theory.

7

some degree, then, Cottles's own testimony created an analytical gap between the undisputed realities of the case and his opinion that these irregularities constituted a defect. *See Gharda*, 464 S.W.3d at 349; *Toups v. Synthes, Inc.*, Civ. A. 14-2544, 2015 WL 6738541, at \*5–6 (E.D. La. Nov. 4, 2015) (holding that plaintiff's expert's agreement that product seemingly met its specifications helped support summary judgment against plaintiff's manufacturing-defect claim); *see also Zea v. Ford Motor Co.*, Civ. A. H-14-3290, 2017 WL 979067, at \*1 (S.D. Tex. Mar. 10, 2017).

Based on similar considerations, the Tenth Circuit held that a trial court properly disallowed an expert opinion on the very belt irregularities that Cottles singled out as defects in this case. *Ho v. Michelin N. Am., Inc.*, 520 Fed. App'x 658, 665 (10th Cir. 2013). There, the expert did not know if the belt irregularities "fell within Michelin's specifications." *Id.* at 661. The court further noted that the expert had "conceded that the peer-reviewed literature suggests that [off-center placement] and dog ears do not cause belt separations, and he was unable to cite any peer-reviewed literature supporting his contrary theory." *Id.* To overcome these failings, the appellant emphasized her expert's experience as a basis for admitting his belt-irregularity opinions. *Id.* at 664–65. The Tenth Circuit was unpersuaded: "Experience is not necessarily a password to admissibility . . . ." *Id.* at 665.

In line with *Ho*, we will uphold the exclusion of Cottles's belt-irregularity opinions. This is not one of those rare cases where the expert's experience, in itself, paves a path to the admission of his theory. *See Ledesma*, 242 S.W.3d at 41. Rather,

8

because Cottles's belt-irregularity theory appeared to go against the majority of the established literature and testing, and because Cottles seemingly agreed that there was no manufacturing defect insofar as the tire irregularities remained within specifications, we conclude that the trial court did not abuse its discretion by excluding this testimony.[4]

Next, we consider Cottles's theory concerning liner pattern marks. In his affidavit, Cottles thoroughly explained the process by which tires are designed and constructed. He explained that certain aspects of Michelin's production process (which we do not discuss due to the sealing order) cause substantial delay, during which the raw rubber of the tire's components can dry out, lose its tackiness, and permanently take on the pattern of the liner in which it is shipped to the plant. According to Cottles, this decline in the condition of the materials can impede the bonding that is supposed to occur when the raw materials of the tire are heated and "cured" together. Cottles cited sources explaining that any liner marks should be obliterated in a properly cured tire. Thus, he attested that when he observes liner marks on a tire, he takes it as strong evidence that the tire did not properly bond in the first place due to the condition of the materials. Cottles testified that the failed tire in this case displayed liner pattern marks, and he offered a photograph of the tire's inner rubber layer, which had a coarse grid pattern on it.

---

[4]Appellants offer orders from nearly twenty cases in which Cottles advanced similar theories and the trial court denied a motion to exclude Cottles's testimony. We do not hold that these cases were wrongly decided. We only hold that the trial court did not abuse its discretion by ruling as it did in this case.

To substantiate his theory that liner marks indicate poor bonding, Cottles offered quotations from four publications and three depositions. Some of the sources that Cottles cited in support of his liner-mark theory seemed to offer persuasive, direct support for his opinions, making the admissibility of this theory a close question.

Still, in its discretion, the trial court could have rationally questioned the provenance of some of these sources or, as to one source, the relevance of its quoted content. One quotation was drawn from a 1993 article in an obscure and now-defunct trade magazine. The Texas Supreme Court has questioned the validity of another one of Cottles's sources, a book by Richard "Rex" Grogan, under the test of peer review. *See Cooper Tire & Rubber Co. v. Mendez,* 204 S.W.3d 797, 802 (Tex. 2006). Another quotation, which was taken from The Handbook of Rubber Bonding, gave only indirect support for Cottles's conclusion. As for the depositions, the quotations do not state whether the deponents were engineers, experts, or tire designers whose opinions might have valid bearing on the reliability of Cottles's testimony.[5] By contrast, Cottles agreed at his deposition that there were multiple published, peer-reviewed studies that directly went against his liner-mark theory.

In *Cooper Tire*, the court upheld the exclusion of an opinion on liner marks based on doubts about the sources that the expert used to support his theory. *See id.* at 802,

---

[5]We do not imply that an expert's sources must indicate these things in order for the source to have any use in the *Robinson* context. We merely note that the trial court would have been within its rights to question the sources based on the lack of these qualifications.

805.  Similarly, in *Kehler v. Bridgestone Americas Tire Operations, LLC*, the court excluded a liner-mark opinion based on deficiencies in the expert's supporting materials.  No. 15-CV-127-J, 2016 WL 8316771, at *6 (D. Wyo. Dec. 1, 2016); *see also Beauregard v. Cont'l Tire N. Am., Inc.*, 695 F. Supp. 2d 1344, 1351–53 (M.D. Fla. 2010), *aff'd*, 435 Fed. App'x 877 (11th Cir. 2011).  In the same way, the trial court here might have rationally doubted Cottles's theory based on the provenance of his sources, especially in light of the literature that cut against his liner-mark theory and the Texas Supreme Court's disapproval of a liner-mark theory in *Cooper Tire*.  Thus, in terms of the *Robinson* factors, the trial court could have fairly questioned the theory's reliability (1) as a generally accepted principle (2) that was validated by peer review.

Moreover, Appellants offered nothing to satisfy the other *Robinson* factors.  There was no evidence that Cottles had attempted to quantify the degree to which liner markings correlate with tire failure, leaving his opinion at least slightly subjective.  *See Cooper Tire*, 204 S.W.3d at 802 (faulting a tire-defect opinion for this reason).  Moreover, Cottles agreed at his deposition that he was not aware of any testing concerning liner marks or his theory's rate of error.

Again, the sources and thorough explanation that Cottles produced in support of his theory make this question a close one.  But "[c]lose calls must go to the trial court" where the admissibility of expert opinion is concerned.  *Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006) (per curiam).  We hold that the trial court did not abuse

its "broad discretion" in excluding this testimony. *See Helena Chem.*, 47 S.W.3d at 499. We overrule Appellants' first issue.

## III. DIRECTED VERDICT ON GROSS NEGLIGENCE

In their second issue, Appellants contest the directed verdict on their gross negligence claim. Appellants assert that their evidence raised a fact issue on both prongs of gross negligence, such that a directed verdict was inappropriate.

A directed verdict is only proper in limited circumstances: (1) when the evidence is insufficient to raise a material fact issue, or (2) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent. *JPMorgan Chase Bank, N.A. v. Prof'l Pharmacy II*, 508 S.W.3d 391, 414–15 (Tex. App.— Fort Worth 2014, no pet.). In reviewing the grant of a directed verdict, an appellate court follows the standards for assessing the legal sufficiency of the evidence. *Lennon II Family L.P. v. Gideo*, No. 02-18-00250-CV, 2019 WL 4124399, at *10 (Tex. App.— Fort Worth Aug. 29, 2019, pet. denied) (mem. op.). We review the evidence in the light most favorable to the person suffering the adverse judgment. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. An appellate court must determine whether there is any evidence of probative force to raise a fact issue on the question presented. *Lennon II Family*, 2019 WL 4124399, at *10; *see, e.g., Henry S. Miller Commercial Co. v. Newsom, Terry & Newsom, L.L.P.*, No. 05-14-

12

01188-CV, 2016 WL 4821684, at *5 (Tex. App.—Dallas Sept. 14, 2016, pet. denied) (mem. op.) (analyzing the propriety of directed verdict on a gross negligence claim).

"Gross negligence has both an objective and a subjective component." *Medina v. Zuniga*, 593 S.W.3d 238, 247 (Tex. 2019). First, viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others. *Id.* Second, the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *Id.* Under the objective element, an extreme risk is "not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *Id.* (quoting *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998)). To establish the subjective component, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care. *Id.* at 248. The risk should be examined prospectively from the perspective of the actor, not in hindsight. *Id.* The defendant need not have anticipated the precise manner of harm or to whom the injury would befall to have had awareness of the extreme risk. *Id.*

The question presented is whether Appellants created a fact issue as to both prongs of gross negligence. We conclude that they did not.

To begin, we agree that Appellants produced some evidence that the failed tire was defective in three ways. The first alleged manufacturing defect was that the tire's inner layers contained pockets of trapped air. The second alleged manufacturing defect

13

was that the tire's inner layers were inadequately bonded together during the molding and curing process, possibly due to the age of the tire's raw materials prior to curing. Appellants argued that the air pockets and inadequate bonding left the tire's inner layers free to rub together and exposed to the air, which in turn caused the tire's inner structure to degrade and oxidize. All of these problems, Appellants said, left the tire more vulnerable to the outward inertial load of the tire's rotation and, thus, more susceptible to tread separation.

According to Appellants, the problems posed by these manufacturing defects were compounded by a third defect: the lack of a nylon cap ply, a layer of material that would have enveloped the steel belts and better helped combat the forces that contributed to tread separation. Appellants complained that instead of a nylon ply, the tire incorporated a third steel belt that only increased the tire's inertial problems.

Appellants presented expert evidence in support of all three of these defect theories. For instance, as to their trapped air theory, Appellants' expert testified that he observed a concave patch of smooth rubber on the inner layers of the tire that indicated a pocket of trapped air. Appellants also offered evidence of shortcomings in Michelin's manufacturing process that might have led to air pockets. According to Appellants' evidence, a leaky roof at the plant where the tire was manufactured might have let water drip onto the raw materials of the tire, and when the tire was superheated during the molding and curing process, even a single droplet of water would have expanded dramatically, creating a steam blister of trapped air. To that end, Appellants offered

evidence that there was rain in the area during the week when the tire was manufactured. There was also evidence that workers at the plant perspired as they handled the tires during the building process, which Appellants theorized might have led to the same sort of steam blisters. Appellants also pointed to the chemicals that were sometimes used on the raw rubber as a potential source of blisters. Appellants presented a similar quantum of proof in support of their inadequate-bonding and nylon-cap theories.

However, Appellants offered no evidence that Michelin was subjectively aware that these alleged manufacturing and design defects posed an extreme degree of risk but that Michelin nonetheless proceeded in manufacturing the tire with conscious indifference to the risk. Put simply, there was no evidence demonstrating Michelin's awareness that air pockets, inadequate bonding, and the lack of a nylon cap gave rise to a serious hazard.

Indeed, there was plenty of evidence to the contrary. Michelin's witnesses consistently denied that they knew of any defects in the company's manufacturing and design process that could be hazardous to customers, and they testified that to the best of their knowledge, the company proceeded with the utmost caution throughout the process. For example, as to Appellants' air-pocket theory, Michelin offered evidence that whenever the roof leaked, the company hung plastic tarps to make sure that no water dripped on the tires, and that if any water fell onto the raw materials that could pose a danger to customers, Michelin would scrap the tire. As to perspiration, Michelin representatives testified that the plant in question is climate controlled to seventy-two

15

degrees and that they had never seen employees dripping sweat onto the tires. Even supposing that air or fluid might have initially been present within the tire, Michelin's witnesses testified that the company used rollers on the tires during the manufacturing process to ensure that any air or fluid was pressed out of the inner layers. Two Michelin witnesses testified that in their decades at Michelin, they had never seen trapped air between a tire's belts or at the belt's edges, and another witness testified that while he had seen trapped air at least once before, it was a "very, very, very, very" rare occurrence. And Appellants produced no countervailing evidence to show Michelin's actual awareness that this alleged air-pocket defect or the other supposed defects posed an extreme risk of harm.

Because there was no evidence that Michelin was aware of an extreme risk (and plenty of evidence to the contrary), we hold that the trial court did not err in granting a directed verdict on gross negligence. We overrule Appellants' second issue.

## IV.    IMPROPER JURY ARGUMENT

The subject of Appellants' third issue is one of many caustic remarks by Michelin's trial counsel. During closing argument, Michelin's counsel was attempting to rebut an argument by the other side when he called Appellants' argument "dishonest as the day is long." Appellants did not object to this remark. Instead, they made it the subject of a motion for new trial. Appellants contend that the denial of their motion for new trial was reversible error because this jury argument was both improper and incurable.

16

We review a trial court's denial of a motion for new trial for an abuse of discretion. *In re R.R.*, 209 S.W.3d 112, 114 (Tex. 2006) (per curiam). A trial court abuses its discretion when it acts in an unreasonable or arbitrary manner or, stated differently, when it acts without any reference to guiding rules or principles. *In re Thetford*, 574 S.W.3d 362, 374 (Tex. 2019) (orig. proceeding).

Appellate complaints of improper jury argument must ordinarily be preserved by timely objection and request for an instruction to disregard, along with a ruling on the objection. *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). Typically, a retraction of the argument or an instruction from the court can cure any probable harm, but in rare instances the probable harm cannot be cured. *Living Ctrs. of Tex., Inc. v. Peñalver*, 256 S.W.3d 678, 680 (Tex. 2008) (per curiam). In such instances, the argument is incurable, and complaint about the argument may be made if preserved through a motion for new trial. *Id.*; *see Phillips*, 288 S.W.3d at 883.

The party claiming incurable harm must establish that, based on the record as a whole, the offensive argument was so extreme that a juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument. *Phillips*, 288 S.W.3d at 883. The complaining party must establish that the argument by its nature and degree constituted such error that an instruction from the court or retraction of the argument could not remove its effects. *Living Ctrs.*, 256 S.W.3d at 680–81; *see Wade v. Tex. Emp'rs Ins. Ass'n*, 244 S.W.2d 197, 201 (Tex. 1951) ("We judge by the degree of the vice . . . .").

17

Examples of incurable arguments may include appeals to racial prejudice; accusing the opposing party of manipulating a witness without evidence of witness tampering; comparison of opposing counsel to Nazis experimenting on the elderly; and other unsupported, extreme, and personal attacks on opposing parties and witnesses. *See Living Ctrs.*, 256 S.W.3d at 681 (collecting cases); *see also, e.g., Showbiz Multimedia, LLC v. Mountain States Mortg. Ctrs., Inc.*, 303 S.W.3d 769, 772 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (holding that a party made incurable argument when referring to the litigation strategy of a South Asian man as "judicial terrorism and extortion," along with other inflammatory comments).

But "[n]ot all personally critical comments concerning opposing counsel are incurable." *Living Ctrs.*, 256 S.W.3d at 681. Indeed, less-than-galling attacks on the veracity of the other side's arguments are generally held to be curable. For example, one court held that there was no incurable jury argument when an attorney asked the jury, regarding opposing counsel, "What kind of snake oil is he selling you?" *Metro. Transit Auth. v. McChristian*, 449 S.W.3d 846, 855 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Another court held that no incurable harm occurred when counsel accused the other side of "fabrication" and said, "[T]hey can hide behind their lawyers, and they can hide behind their lie, but what they can't hide from is the truth." *McKenzie v. Positive Action Int'l, Inc.*, No. 01-10-01073-CV, 2012 WL 1454478, at *29–30 (Tex. App.—Houston [1st Dist.] Apr. 26, 2012, pet. denied) (mem. op.). In another case, counsel accused the other party of making up one of the key elements of its case at the

18

behest of its attorneys, but the court nonetheless held this argument curable. *See Jones v. Republic Waste Servs. of Tex., Ltd.*, 236 S.W.3d 390, 400, 403 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). In still another case, the court found there was no incurable harm when counsel implied that the other side was "twisting, turning, exaggerating, repeating over and over, misstatement of facts, until the hope is that some people of twelve will accept those as true facts." *Beavers on Behalf of Beavers v. Northrop Worldwide Aircraft Servs., Inc.*, 821 S.W.2d 669, 680 (Tex. App.—Amarillo 1991, writ denied). And most salient here, another court held that there was no incurable harm when counsel said of the other side's argument, "That's dishonest." *Hopkins v. Phillips*, No. 05-18-01143-CV, 2019 WL 5558585, at *1, *3 (Tex. App.—Dallas Oct. 29, 2019, pet. denied) (mem. op.). Michelin's reference to Appellants' argument as "dishonest as the day is long" fits in the mold that these cases have carved for improper but curable remarks.

Moreover, if the question under *Phillips* is whether this comment could have swayed an ordinary juror from one side to the other, the effect of this comment is dwarfed by the other argument and evidence in this case's massive record. *See* 288 S.W.3d at 883. The parties conducted a two-week jury trial in which each side thoroughly made its case, exploring every facet of Michelin's tire-production process, its supposed flaws, and their alleged relation to an accident in which two women lost their lives. While Michelin's comments are not to be applauded, we doubt that they added a great deal to that mass of proof and persuasion.

19

Michelin's improper argument therefore did not cause incurable harm. We hold that the trial court did not abuse its discretion by denying Appellants' motion for new trial, and we overrule Appellants' third issue. *See R.R.*, 209 S.W.3d at 114.

## V. EVIDENCE OF DAMAGES

In their fourth issue, Appellants assert that the jury's finding of no damages is contrary to the great weight and preponderance of the evidence. Citing this court's opinion in *Hammett v. Zimmerman*, Appellants argue that a jury is not free to award zero damages where there is uncontroverted evidence that establishes an objective injury, such as Witt's broken bones. *See* 804 S.W.2d 663, 664–66 (Tex. App.—Fort Worth 1991, no writ) (citing, among many others, *Crowe v. Gulf Packing Co.*, 716 S.W.2d 623, 624 (Tex. App.—Corpus Christi–Edinburg 1986, no writ)).

However, *Hammett* and its forebears like *Crowe* have soundly been distinguished in cases where the jury finds no liability. *See Lehmann v. Wieghat*, 917 S.W.2d 379, 384–85 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (distinguishing *Hammett* on this account); *Ramsey v. Lucky Stores, Inc.*, 853 S.W.2d 623, 635 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (distinguishing *Crowe* on this account); *see also Adams v. Donahue*, No. 07-97-0266-CV, 1998 WL 483379, at *6 (Tex. App.—Amarillo Aug. 18, 1998, no pet.) (mem. op.). "It has long been the law in Texas that a finding of zero damages, even if contrary to the uncontroverted evidence, is rendered immaterial[] by a finding of no liability." *Ramsey*, 853 S.W.2d at 635 (citing *S. Pine Lumber Co. v. Andrade*, 124 S.W.2d 334, 335 (Tex. [Comm'n Op.] 1939)). A zero-damage award presents no

20

reversible error when the jury finds that the defendant was not liable, because even if damages were awarded, the trial court would still be required to enter a take-nothing judgment. *Id.* Thus, in *Ramsey*, a finding that a product was not defective obviated the need to consider whether the evidence allowed a zero-damage award. *Id.*

Following the jury verdict, Appellants voluntarily settled and dismissed their claims against the only party that was found to have any liability for the collision, Morgans of Briar Oaks. Morgans of Briar Oaks is not a party to this appeal. The only defendant who remains involved in this appeal is Michelin, but the jury found that Michelin's tire was not defective and that Michelin had no liability for the collision. It is therefore immaterial whether the evidence of injury and suffering permitted a zero-damage award, because the only remaining appellee was already entitled to a take-nothing judgment. We overrule Appellants' fourth issue.

## VI.   SEALED RECORD

In their fifth and final issue, Appellants bring multiple challenges against the trial court's decision to seal certain portions of the record. We address each of these challenges in turn.

## A.   Did Michelin Satisfy the Substantive Dictates of Rule 76a?

To begin, Appellants argue that Michelin has failed to justify sealing the records under Rule 76a. Appellants assert that Michelin failed to carry its burden under Rule 76a because Michelin made only a conclusory case for its interest in sealing the records. As to the vast majority of the sealed documents and testimony, we disagree and hold

21

that Michelin demonstrated a specific and substantial interest in sealing these records. However, as we explain, we hold that Michelin failed to satisfy Rule 76a with regard to a subset of the sealed records.

We review the trial court's sealing decisions for an abuse of discretion. *Gen. Tire, Inc. v. Kepple*, 970 S.W.2d 520, 526 (Tex. 1998); *Nguyen v. Dall. Morning News, L.P.*, No. 2-06-298-CV, 2008 WL 2511183, at *3 (Tex. App.—Fort Worth June 19, 2008, no pet.) (mem. op.) (per curiam). Rule 76a provides the standard and procedures for sealing court records. *See Gen. Tire*, 970 S.W.2d at 523. The rule creates a presumption that all court records are open to the public and allows trial courts to seal court records only upon a showing of all of the following:

(a) a specific, serious and substantial interest which clearly outweighs:

(1) this presumption of openness;

(2) any probable adverse effect that sealing will have upon the general public health or safety;

(b) no less restrictive means than sealing records will adequately and effectively protect the specific interest asserted.

Tex. R. Civ. P. 76a(1).

Rule 76a does not require the court to make factual findings, but rather requires it to balance the public's interest in open court proceedings against an individual litigant's personal or proprietary interest in privacy. *Gen. Tire*, 970 S.W.2d at 526; *In re Browning-Ferris Indus., Inc.*, 267 S.W.3d 508, 512 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (combined appeal & orig. proceeding). The party moving for sealing has the

22

burden to rebut the presumption of openness by a preponderance of evidence. *Nguyen*, 2008 WL 2511183, at *4.

"The specific interests to be considered for sealing can be 'financial, reputational, or otherwise.'" *Cortez v. Johnston*, No. 06-13-00120-CV, 2014 WL 1513306, at *4 (Tex. App.—Texarkana Apr. 16, 2014, no pet.) (mem. op.) (quoting *McAfee v. Weiss*, 336 S.W.3d 840, 845 (Tex. App.—Dallas 2011, pet. denied)). "That a document contains trade secret information is a factor to be considered in applying this sealing standard." *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 614 (Tex. 1998) (orig. proceeding).

To support its motion, Michelin submitted an affidavit by Michael Johnson, the personnel manager at the plant where the failed tire was manufactured. Johnson attested that the evidence in question related to Michelin's trade secrets, and his testimony closely aligned with the six factors we use to judge whether information constitutes a trade secret.[6] According to Johnson, the tire manufacturing industry is highly competitive and heavily dependent upon proprietary innovation, research, and development. He explained that Michelin closely guarded the secrecy of its processes

---

[6]To determine whether a trade secret exists, we weigh six factors in the context of the surrounding circumstances: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *In re Union Pac. R.R. Co.*, 294 S.W.3d 589, 592 (Tex. 2009) (per curiam) (orig. proceeding).

in order to preserve a competitive edge and to develop quality products. By Johnson's account, Michelin had spent many years and many millions developing its manufacturing techniques, machinery, and methods of production, and Michelin's competitors could not duplicate Michelin's approach without a similar investment. He testified that these processes were not known to Michelin's competitors or the general public and that Michelin takes "extraordinary measures" to maintain their secrecy:

> For one, [Michelin] usually does not seek patents for its processes and machinery for fear of losing their secrecy. Also, [Michelin] plants are not open to the public and are subject to a strict security regiment [sic]. Furthermore, [Michelin] employees acknowledge the proprietary processes and equipment and other trade secrets, and [they] agree not to divulge that proprietary information and [those] trade secrets to the public or to a competitor.

He projected that allowing the trade secrets in the court records to be divulged could result in heavy losses for the company and its thousands of employees. According to Johnson, Michelin had a specific, serious, and substantial interest in maintaining the confidentiality of the information at issue. And it was Johnson's opinion that there was no less restrictive way to preserve the integrity of this information than to permanently seal the records in question.

For the vast majority of the sealed records, there is reason to accept Johnson's characterization of the records' nature and content. For instance, the trial court sealed a set of trial exhibits that consisted of tire specifications, guides concerning the design and failure of Michelin's tires, and internal documents for analyzing the performance and failure of tires. The trial court also sealed Appellants' summary judgment response,

24

which incorporated deposition transcripts wherein Michelin personnel described the company's inner workings and production process. Likewise, the trial court sealed selected trial testimony in which witnesses discussed the intimate details of Michelin's tire specifications, production process, and quality control.[7] The trial court could have rationally determined that these documents contained commercially valuable insights not known outside of Michelin. We agree that Michelin carried its burden to demonstrate a specific, serious, and substantial interest in sealing these records that outweighed the presumption of openness, as well as that no less restrictive means would suffice.

We cannot say the same, however, for one specific set of documents: Appellants' response to Michelin's motion to exclude Cottles's testimony, Appellants' motion to reconsider the exclusion of Cottles's testimony, and the proof that was appended to these two filings. As they appeared in the sealed clerk's records, these documents were already redacted to prevent exposure of Michelin's trade secrets. These redactions prove that there was a less restrictive means of protecting Michelin's interests with respect to these documents, because without the redacted content, these filings and

---

[7]The special procedures of Rule 76a apply only to the sealing of "court records," a term that includes "all documents of any nature filed in connection with any matter before any civil court." *Gen. Tire*, 970 S.W.2d at 523; *Tex. Voices for Reason & Justice, Inc. v. City of Argyle*, No. 02-16-00052-CV, 2017 WL 1173837, at *2 (Tex. App.—Fort Worth Mar. 30, 2017, no pet.) (mem. op.). Appellants do not dispute the trial court's implied finding that these trial transcripts constitute court records.

their attached proof were entirely free of anything that could be considered a Michelin trade secret.

For example, Appellants' "Response to Michelin's Motion to Exclude Testimony of Troy Cottles" and the attached affidavits were heavily redacted. As redacted, they only touched upon topics having little to do with Michelin's confidential information: tire production in general; accident reconstruction; Cottles's qualifications, process, and physical inspection of the failed tire; orders and opinions from other courts deeming Cottles's methods reliable; and quotations from publicly available literature that were offered in defense of his opinions.

Similarly, Appellants' "Motion for Reconsideration and Clarification of Letter Regarding Testimony of Troy Cottles" made only a brief, high-level argument urging the trial court to reassess its order excluding Cottles's testimony. Any mention of Michelin's internal operations was redacted, and as redacted, the motion drew upon only publicly available literature supporting Cottles's views, photographs of the failed tire, a recall notice for a Toyo tire, and a deposition from a case against Goodyear rather than Michelin. None of this content derived from Michelin's confidential information.

These redactions concretely showed that Michelin's interests with regard to these few documents could be protected by less restrictive means. *See Al Otro Lado, Inc. v. McAleenan*, No. 17-cv-02366-BAS-KSC, 2019 WL 6220898, at *3 (S.D. Cal. Nov. 21, 2019) (denying request to seal because the documents' "most sensitive details appear[ed] to have already been redacted" and the remainder did not delve into

26

confidential subjects); *Wetzel v. CertainTeed Corp.*, No. C16-1160JLR, 2019 WL 1236859, at *5 (W.D. Wash. Mar. 18, 2019) (denying seal because the documents had "already been appropriately redacted"); *Airbus DS Optronics GmbH v. Nivisys LLC*, No. CV-14-02399-PHX-JAT, 2017 WL 992348, at *2 (D. Ariz. Mar. 15, 2017) ("Because it is already sufficiently redacted, the Court finds no compelling reason to cause the exhibit to be filed under seal."); *Reed v. Chase Home Fin., LLC*, No. Civ. A. 11-0412-WS-C, 2012 WL 4434751, at *2 & n.2 (S.D. Ala. Sept. 26, 2012) (similar). We conclude that the trial court abused its discretion by sealing these documents. To hold otherwise would disserve the principle of openness that is embodied in Rule 76a.[8]

But aside from these two filings and their attached documents, Michelin satisfied its initial burden under Rule 76a with regard to the remaining sealed records. We therefore proceed to address Appellants' other arguments for unsealing the remaining sealed records.

---

[8]The enactment of Rule 76a was a sweeping reform that Justice Doggett described as "Courtroom Glasnost," and he argued that it served the public interest in four ways. *See* Lloyd Doggett & Michael J. Mucchetti, *Public Access to Public Courts: Discouraging Secrecy in the Public Interest*, 69 Tex. L. Rev. 643, 648, 684 (1991). First, greater access to judicial records promotes public health and safety because "secrets buried in court records, literally, kill and maim," with the prime examples being hazardous products that might otherwise be avoided if their dangers were disclosed to the public. *Id.* at 648–49. Second, access to judicial records guards against the loss and suppression of essential records. *Id.* at 650. Third, access fosters integrity in the judiciary in that free disclosure acts as a check on foul play from the bar and the bench. *Id.* at 650–51. Fourth, Justice Doggett argued that "greater access strengthens democracy" because "[p]ublic court records are rich with democracy's indispensable raw material: information." *Id.* at 652–53.

**B.    Was the Sealing Order Untimely?**

Next, Appellants assert that the sealing order must be reversed because it was untimely under Rule 76a(5), which requires a temporary sealing order to set the time for a hearing and to direct the movant to immediately give the public notice. *See* Tex. R. Civ. P. 76a(5).

However, Rule 76a(5) pertains only to temporary sealing orders. By the time Appellants appealed, the trial court had rendered a permanent sealing order using the correct procedures. The time-oriented language contained in Subsection 5 does not apply to this permanent sealing order. Ergo, we do not agree with Appellants' contention that the failure to comply with Subsection 5's mandates is "fatal" to the trial court's permanent sealing order.

It is true that earlier in the case, the trial court rendered a temporary sealing order. But any issues stemming from that order are now moot. "Appeals of some interlocutory orders become moot because the orders have been rendered moot by subsequent orders." *Hernandez v. Ebrom*, 289 S.W.3d 316, 319 (Tex. 2009); *see Pearland Capital Grp., LP v. Horizon United Grp. Int'l, LLC*, No. 01-11-00324-CV, 2011 WL 4611533, at *2 (Tex. App.—Houston [1st Dist.] Sept. 30, 2011, no pet.) (mem. op.) (collecting cases from different contexts). For example, a permanent injunction will render an appeal of a temporary injunction moot. *Isuani v. Manske-Sheffield Radiology Grp., P.A.*, 802 S.W.2d 235, 236 (Tex. 1991) (per curiam). In the same way, any

28

complaint concerning the temporary sealing order became moot when the trial court rendered a permanent sealing order in compliance with Rule 76a.

In sum, Appellants' timeliness argument is (1) moot with respect to the temporary sealing order and (2) inapplicable to the permanent sealing order.

## C. Does the Fact that Some of the Sealed Records are Already Part of the Public Record Preclude Their Sealing?

Lastly, Appellants contend that the permanent sealing order must fall because some of the records sealed were already part of the public record. Appellants assert that some of the sealed documents were available in the unsealed files of other cases, whether from the PACER system of the federal courts or the websites of Texas state courts.

We agree that the records' status as part of the public domain should inform the question of whether to seal them. For instance, the Fourth Circuit has recognized that in determining whether or not to seal a record, it was important to weigh "whether the public has already had access to the information contained in the records." *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984) (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597–608, 98 S. Ct. 1306, 1311–17 (1978)); *see Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004) (same); *see also Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1184 (9th Cir. 2006) (holding that the public availability of documents weighed against the case for sealing).

However, the Fourth Circuit balanced this consideration against "whether the records are sought for improper purposes, such as . . . unfairly gaining a business advantage." *Knight Publ'g*, 743 F.2d at 235. The Tenth Circuit struck a similar balance when it recognized that "business information that might harm a litigant's competitive standing" might justify sealing records even though the underlying materials were "already entered into the public record," especially when the trial court treated that information in a sensitive manner to preserve its confidentiality. *Braun v. Medtronic Sofamor Danek, Inc.*, 719 Fed. App'x 782, 801 n.8 (10th Cir. 2017); *see United States v. Kravetz*, 706 F.3d 47, 63 (1st Cir. 2013) (directing the district court to balance a privacy interest in medical information against the "prior publication" of that information).

We agree with this balanced treatment. If the information in the case at hand is truly sensitive, the fact that the information is available in one case among the haystack of thousands on PACER should not *necessarily* require that it be available in all other cases, for there is no guarantee that those without an unlimited budget for legal research will find that particular needle. That is, there is something to be said for preserving the scarcity of sensitive information, even if its complete secrecy cannot be attained. This is perhaps especially true when the trial court handles the records sensitively throughout the case at hand, *see Braun*, 719 Fed. App'x at 801 n.8, because as the Supreme Court recognized in *Nixon*, the trial court's informed discretion may be the best barometer of whether there is a need to refrain from further publicizing confidential information. *See* 435 U.S. at 599, 98 S. Ct. at 1312–13.

30

Here, Appellants demonstrated that some of the sealed documents were already part of the public record. But the trial court recognized the risk that competitors might nonetheless gain an unfair business advantage if the availability of these documents were expanded. Consistent with that risk, the trial court sensitively handled the information when it entered a protective order to guard against disclosure early in the discovery process, rendered an interim sealing order to prevent disclosure midstream of the litigation, and signed a permanent sealing order after the trial concluded. In light of that sensitive handling and Michelin's demonstrated interest in preserving its competitive advantage, we hold the trial court did not abuse its discretion in sealing these documents, despite the prior public availability of some of them.

## D. Summary

We hold that the trial court abused its discretion by sealing Appellants' response to Michelin's motion to exclude Cottles's testimony, Appellants' motion to reconsider the exclusion of Cottles's testimony, and the proof that was appended to these two filings. We hold that the trial court did not abuse its discretion in sealing all other records in question. We therefore sustain Appellants' fifth issue in part.

## VII. CONCLUSION

We reverse the trial court's sealing order to the extent that it seals Appellants' response to Michelin's motion to exclude Cottles's testimony, Appellants' motion to reconsider the exclusion of Cottles's testimony, and the attached proof, and we render

31

judgment unsealing those records. We affirm the trial court's judgment and sealing order in all other respects.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: September 10, 2020